## HARRY HILL *v.* THE STATE.

1. JURY LAW.—The law regulating the organization of juries in criminal trials does not confide to the trial judge a discretionary power to excuse a juror summoned on a special *venire*, and such action on the part of the court is error notwithstanding the defendant did not interpose instant objection, and notwithstanding that he did

not exhaust his peremptory challenges.  See the opinion *in extenso* on the question.

2. CHARGE OF THE COURT.—When the evidence in a murder trial has even the least tendency to bring the case under the provisions of arts. 570 and 572 of the Penal Code, it is incumbent on the court to give in charge to the jury the law governing such defenses, and they must be stated distinctly.  See the opinion for a charge *held* error as blending the two articles.

APPEAL from the District Court of Fort Bend.  Tried below before the Hon. W. H. BURKHART.

The indictment charged the murder of W. R. Croxton. The conviction was for murder in the second degree, with the penalty assessed at a term of 25 years in the penitentiary.

Mrs. Croxton, the wife of the deceased, was the first witness for the State.  She testified that on the evening of January 12, 1878, the defendant rode up to the house occupied by the deceased and the witness, called the deceased out of the house, and told him that he wanted the rent for the house.  The deceased told him that he had no money, but would go to the defendant's mother's house on Monday morning following, and work the debt out.  The defendant replied that he did not want work but wanted money.  As the deceased spoke of working the debt out, he stepped up to the defendant, who did not dismount from his horse, and placed his hand on the defendant's knee.  About this time, the witness, who up to this time was standing on the gallery, turned to go into the house.  Her daughter Parthena called out to witness "look at papa."  The witness looked and saw her husband staggering, and bleeding profusely from a cut in the right arm below the elbow, and from which wound he died in a few minutes.  While talking to the deceased the defendant's horse stood fronting the house.  There was an open cistern between the gallery of the house and where the defendant stood on horseback.

The horse ridden by defendant appeared very restless during the interview between deceased and defendant.

Between the testimony of this witness and that of her daughter, Parthena, there is no material variance. The latter, however, saw the blow when it was inflicted, though she did not see the weapon. She, however, located her father, the deceased, on the left side of the defendant, whereas her mother was equally positive that he was standing on the defendant's right side, when he was cut. It was shown that the wound was on the right arm, and that it severed the radial artery. The attending physician testified that if he could have reached the wounded man fifteen minutes sooner than he did, he could have preserved his life by stopping the flow of blood.

Larkin Tolliver testified, for the defense, that at the time of the difficulty he was passing the house occupied by the deceased, and which was rented from the defendant's mother. He stopped his wagon on hearing some words which indicated an altercation between the two, and approached within sixty feet of the gallery, and took his position behind a large mulberry tree. He saw the deceased take hold of the bridle rein of the defendant's horse, and attempt to force the horse and rider into an unclosed cistern. In order to release his horse, the defendant cut the deceased on the arm.

The defense relied upon was self-defense, and the testimony to establish it was that of Larkin Tolliver, to the effect that the defendant cut the deceased in order to prevent the latter from pushing him and his horse into the uncovered cistern. By the daughter of the deceased it had been testified that the only persons present in the neighborhood at the time of the assault were herself and her mother; and that Tolliver was not in the neighborhood, and that if he had been, his presence would certainly have been discovered by her. To support the

probable truth of the witness Tolliver, appears to have been the subsequent struggle. To support this witness, it was testified by an inmate of Dr. McCloy's household that Tolliver did deliver a load of wood at the Doctor's place about half an hour after the Croxton children gave the alarm and told of the cutting of the deceased. By another witness, who went to examine the ground, it was testified in behalf of the defense that horse tracks, within two feet of the open cistern, were found, and that they indicated an attempt to push the horse backwards in that direction. It was further shown in defense that the appellant's flight was in obedience to the advice of his relatives, and because of the excited condition of public opinion.

In rebuttal the State introduced D. K. Hinkle. He testified that shortly after the cutting of the deceased, he heard that the excuse relied upon was that the deceased was trying at the time to push the defendant and his horse into the cistern, and he examined the ground and found that the horse track nearest the cistern was nine feet distant. By two other witnesses it was testified that, on the evening or morning subsequent to the *habeas corpus* trial, the witness Larkin Tolliver told them in front of Frost's store in Richmond that he was so drunk at the time he was examined, he did not know what he said; that he did not see Croxton try to push the horse into the cistern; that Hill and Croxton were talking about money, Croxton standing near with his hand on the horse's neck or Hill's knee, when Hill struck Croxton with some kind of knife that he must have had in his hand all the time; that if he said on the *habeas corpus* trial that Croxton was trying to push Hill's horse into the cistern it was because the judge and lawyers plied him with so many questions, and he was so drunk, he did not know how to answer. Tolliver, on re-examination by the defense, denied the conversation and statements imputed to him by the two witnesses, as above set forth.

The motion for new trial was supported by the affidavits of two witnesses charging one of the jurors with statements affirming his conviction of the defendant's guilt, before he went upon the jury. These affidavits were met with that of the impugned juror, qualifying the statements imputed to him, and affirming his entire want of prejudice or opinion when he went upon the jury.

*Jones & Garnett* filed an able brief and argument for the appellant.

*H. Chilton,* Assistant Attorney General, for the State.

HURT, J. The appellant was tried and convicted of the murder of W. R. Croxton, the jury finding him guilty of murder in the second degree, and fixing his punishment at confinement in the penitentiary for the term of five years.

We are informed by bill of exceptions that eight jurors were accepted and sworn to try the case, and that one Zack Cash (one of the eight) being informed that there was sickness in his family, the court, upon its own motion, and without first having the consent of the defendant or his counsel (the defendant however not objecting), discharged said Cash from serving as a juror in the case. It is true that the jury was not complete, but, in forming a jury in a capital case, each venireman is tested, and if accepted by both parties is sworn to try the case.

The learned judge appends, in explanation, the following: "The above is allowed, with the following remark or explanation, that up to the time Zack Cash was excused only eight jurors had been elected, and up to that time the defendant had exhausted only six of his challenges. That, after a jury of twelve had been obtained and before whom this case was tried, the defendant had nine challenges left." The first part of this explanation assumes that until the panel is full, the judge has the

right, whether there be sufficient grounds or not, to excuse a juror. There is no pretence that a necessity existed such as would warrant the court in taking the juror from the list, nor the panel, if full. The action of the court is rested upon the fact that the jury was not full. The other ground is, if anything, less tenable than the first. That the defendant had not exhausted his peremptory challenges cannot in the least degree affect the question. He had a right to that juror — a right given to him by the law of the land. He may have had fifty peremptory challenges remaining, but we are at a loss to understand in what manner he could have exercised these challenges so as to restore to the eight the excused juror. Challenges are for the purpose of ridding the jury of obnoxious jurors, but can never replace one who has been wrongfully or rightfully excused. Though a juror may be without bias or opinion in the case, indeed honest and perfectly competent in every respect, he may possess qualities which would render him very acceptable to the State or defendant. This fact is looked to with great care in the formation of the jury in almost every case. Again, if the judge can, without necessity, excuse from the list of veniremen a juror, though not accepted and sworn, the law requiring a special *venire* and service of copy of the same would be to a great extent thwarted. We have said this much upon this subject in order to express our dissent from the principles announced in the explanations of the learned judge before whom this case was tried.

*Quœre*: The defendant being present, and informed of the action of the court, and not objecting thereto, is he not estopped from complaining afterwards? Has he waived his right to the excused juror by not proclaiming, though not called upon, his objection to his discharge?

In the *Early* case a question somewhat similar was ably and exhaustively discussed by our present presiding judge. In that case the jury had separated. Upon con-

vening of the court, the defendant Early was informed
of the fact, and called upon by the court to say whether
or not the trial should proceed,—the court saying that,
if he desired, the case would be withdrawn from the
jury and continued. The defendant Early refused to
say anything, whereupon the court ordered the trial to
proceed; to which Early excepted. In treating upon that
point (the State insisting upon an estoppel) this court say:
"Nor could the defendant be required to say whether he
waived his rights in the premises. He was on trial for
his life, and it was his privilege and right, if he so de-
sired, by declining to say anything or refusing to waive
any right, to place himself in an attitude to take advan-
tage of any error committed in the proceedings calculated
in any degree to prejudice his case." *Early* v. *State*, 1
Texas Ct. App. 248; 1 Bish. Crim. Proc. sec. 998.

It may be insisted that the defendant should show that
an injury has been done him in this matter. This would
be impossible, for the peculiar traits of character of the
excused juror, which rendered him acceptable to the de-
fendant, can never be shown, and if they could a very
wide field of evidence would have to be entered and ex-
plored. The principles announced in the Early case and
by Mr. Bishop would seem to apply to this case, but the
cases are not precisely analogous. We have thrown out
these remarks by way of caution, and not for the purpose
of deciding the point involved, there being another error
which will necessitate a reversal of the judgment.

The evidence in this case tends (whether strongly or
otherwise does not affect the principle) to bring this case
under the provisions of arts. 570 and 572 of the Penal
Code. Under the first article, if the homicide was com-
mitted for the purpose of preventing murder, etc., it is
not required of the slayer to resort to all other means for
the prevention of the injury. But under art. 572, if the
killing takes place in the protection of the person or prop-

erty against any other unlawful and violent attack besides those mentioned in art. 570, all other means must be resorted to for the prevention of the injury, and the killing must take place while the person killed was in the very act of making such unlawful and violent attack. This is the rule, under the last article, applicable to a case in which the party *attacked* kills his adversary. If, however, the killing is done by another, he is not justified or excused, unless the life or person of the injured party is in peril by reason of such attack upon his property. If the unlawful and violent attack is made upon the person, a stranger has the right to kill under the same restrictions as the party attacked, and no others. But if the killing is to prevent an unlawful and violent attack upon property, to excuse a stranger the life or person of the party injured must be in peril. The record does not present for or require a discussion of the principles applicable to a case in which a stranger kills in behalf of another or his property, but we have thought it proper to make these suggestions.

The learned judge applied the law of art. 570 correctly, but when he attempts the application of art. 572 he blends the two articles. The charge is as follows: "Homicide is justifiable also in the protection of the person against any other unlawful and violent attack besides that of murder, but in such cases all other reasonable means must be resorted to for the prevention of the injury, and the killing must take place while the person killed is in the very act of making such unlawful and violent attack, and the attack upon the person of an individual, in order to justify homicide, must be such as produces a reasonable expectation or fear of death or some serious bodily injury." * * * "A person who is thus unlawfully attacked is not bound to retreat in order to avoid the necessity of killing his assailant. Thus if Croxton was, at the time he received the fatal blow, endeavoring to

push this defendant into an open cistern, which, had he succeeded in doing, would have caused Hill's death, or some serious bodily injury, and if Hill believed it to be necessary in order to save his own life, or to prevent upon himself great bodily injury, to kill Croxton, and if he did kill him, he would be justified in law, provided he used or resorted to every reasonable means at his command in order to avoid this necessity."

If indeed the deceased was, at the time he received the fatal blow, endeavoring to push the defendant into a cistern and thereby cause his death, the defendant was not required to resort to every reasonable means at his command in order to avoid the necessity of killing; for the defendant could have been murdered or maimed as effectually by this means as any other. The court should have charged the jury, in effect, that if they believed from the evidence that it reasonably appeared by the words or acts of the deceased that it was the purpose and intent of the deceased to cast or push the defendant into the cistern and thereby murder or maim him, the defendant would be justified in killing the deceased; and in that case he would not be required to resort to all other means before killing. A charge, though not in all respects correct, indicating this principle, was requested and refused. In the charge of the court the rules of law contained in arts. 570 and 572 were not kept separate and distinct, the one from the other. Of this the defendant complained by bill and in his motion for a new trial. We are of the opinion that this error was fatal to the judgment of the court below. *Horbach* v. *State*, 43 Texas, 242; *Ainsworth* v. *State*, 8 Texas Ct. App. 532; *Kendall* v. *State*, 8 Texas Ct. App. 569, and authorities there cited.

The other questions raised are not likely to arise on another trial. For the error indicated, the judgment is reversed and the cause remanded.

*Reversed and remanded.*